[Cite as *State v. Rios*, 2011-Ohio-3053.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 95364

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JORGE RIOS

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-525322

BEFORE:  Rocco, J., Blackmon, P.J., and S. Gallagher

RELEASED AND JOURNALIZED:  June 23, 2011

-i-

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:    Brian M. McDonough
       Sanjeev Bhasker
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113


KENNETH A. ROCCO, J.:

{¶ 1}  Defendant-appellant Jorge Rios appeals from his convictions for aggravated murder, aggravated burglary and aggravated robbery with firearm specifications, and kidnapping, and from the sentences imposed for those convictions.

{¶ 2} Rios presents four assignments of error.  He argues his convictions are unsupported by sufficient evidence and the manifest weight of the evidence.   He also argues his trial counsel rendered ineffective assistance by failing to file a motion to suppress his statements.  Finally, Rios argues

the trial court improperly sentenced him on both the counts of aggravated murder and aggravated burglary; he contends these were allied offenses.

**{¶ 3}** Upon a review of the record, this court finds his assignments of error all lack merit. Consequently, Rios's convictions and sentences are affirmed.

**{¶ 4}** Rios's convictions result from an incident that occurred on the morning of August 21, 2008. According to the testimony of the state's witnesses, the incident unfolded in the following manner.

**{¶ 5}** Colleen Schade "grew up"[1] in the W. 130th Street and Bellaire Avenue area of Cleveland with Samuel Reed, Jr., whose nickname was "Boy." She maintained her friendship with Reed into her adulthood. On the afternoon of August 20, 2008, Reed called her to ask her if she would drive his vehicle, a tan-colored Chevrolet Tahoe, for him and to take him to an appointment; he was not supposed to be driving, since he did not have a license. Schade obliged.

**{¶ 6}** That evening, Reed called Schade again, this time to invite her out for "a drink." When Reed arrived at Schade's house, she noticed that he wore bright clothing, viz., a yellow T-shirt and a hat with a blue letter "R" stitched on the crown. Reed also brought another man with him, whom

---

[1]Quotes indicate testimony provided at trial.

Schade later identified as Rios.   Once again, Reed asked Schade to drive the Tahoe.

**{¶ 7}**   The three of them stopped at a bar on Puritas Avenue, then proceeded to another bar on Brookpark Road, and, finally, to one near W. 117th Street and Madison Avenue in Lakewood, where they remained until it closed at approximately 2:00 a.m.   During this time, Schade observed that Rios asked   Reed for his cell phone and used it often.

**{¶ 8}**   After the bar closed, Reed directed Schade first to stop at a filling station, where he purchased a bottle of liquor, then to a house located on Archwood Avenue.   Schade waited in the driver's seat while Reed and Rios exited the Tahoe to speak with another man, who eventually entered the vehicle with the other two.   Reed then used his cell phone to call someone.   After this conversation, Reed directed Schade to a house on Bernard Avenue, near W. 105th Street (the "Bernard house").

**{¶ 9}**   Reed told Schade to park on the street.   As she obeyed, she saw a man and a woman emerge from a Jeep parked in front of the Bernard house. Schade recognized the woman, Michelle O'Brien, as someone with whom she had worked a few years previously.[2]

---

[2]Both women admitted they met while working at a "strip bar."

{¶ 10} At that time, Schade, Reed, Rios, and the other man joined O'Brien and her companion and proceeded indoors. Schade discovered O'Brien's companion was David Slaypak. Although O'Brien and Slaypak had been living at the Bernard house for a time, they were planning on moving.

{¶ 11} Schade and O'Brien continued their conversation in the kitchen while the men entered the master bedroom. O'Brien assumed Slaypak was selling some powdered cocaine to them. At one point, Slaypak came out to obtain some beers from the refrigerator, and the man that Schade did not know returned to the kitchen and sat down at the table.

{¶ 12} After approximately twenty minutes, the other men rejoined the women. Reed's group was preparing to leave when Reed noticed the packed boxes. Slaypak explained the plan to move, so Reed asked whether he could buy some of the furniture. Reed also asked if Slaypak could deliver his purchases to his home; O'Brien heard Reed say where he lived. Slaypak apparently was amenable; he and Reed moved a coffee table in which Reed was interested from the lawn to the porch before Schade drove away.

{¶ 13} Upon Schade's arrival at her home at approximately 3:30 a.m., Reed asked her if he could use her car, since the Tahoe's temporary tag had expired at midnight. Schade agreed. Reed drove off with Rios and the other man in Schade's silver Ford Taurus.

{¶ 14} According to Reed's cell phone records, Reed received a call at 3:21 a.m. At that time, he was in the area of Schade's home. By 4:45 a.m., Reed's cell phone records indicate he had returned to the area of the Bernard house, where he remained until at least 5:13 a.m.

{¶ 15} Reed and Rios made a second visit of the night to the Bernard house; shortly thereafter, O'Brien noticed that some money she earlier had placed on the kitchen table was gone. Slaypak and O'Brien believed someone in Reed's group had taken it. Slaypak told O'Brien to call Reed; Reed's number was listed on his phone's log of contacts. Slaypak then went to bed.

{¶ 16} Angered by the missing money, O'Brien made seven separate calls to Reed, demanding he return it. She waited on the front porch for his arrival.

{¶ 17} Reed returned to the Bernard house driving a silver-colored car, parking it on the street a few houses away. Rios and another man accompanied him. When O'Brien saw them approaching, she went to inform Slaypak of their arrival, then came back into the kitchen to see the three men coming inside.

{¶ 18} Rios walked past O'Brien to the bedroom, turned on the light, and told Slaypak to come out. As Slaypak complied, O'Brien went into the bedroom, intending to let Slaypak handle the situation. However, when she

heard Slaypak say, "Please, no. Don't do this," she ran back to the kitchen to find Slaypak "backed into a corner" surrounded by the three men. The unknown man stood in front of Slaypak "with a gun pointed at his chest."

{¶ 19} All three of the men demanded to know where Slaypak kept his money. Reed then "punched him in his face and he kind of buckled, and [Rios] started to hit him" as well. Slaypak fell to the floor.

{¶ 20} The man holding the gun turned to O'Brien, pointed it at her, and ordered her to find the money. O'Brien saw the other two men continue to strike Slaypak, so she attempted to comply; while the unknown man kept the gun trained on her, she ran into the bedroom, opening drawers and turning the mattress, but she was unable to locate the place Slaypak hid his cash.

{¶ 21} Reed began hitting Slaypak with a saucepan. Followed by Rios, who was "flexing" as if to hit her, too, O'Brien ran past the kitchen into the dining room, searched her bookshelf, then proceeded to the living room. She heard Slaypak scream that the neighbors would hear, heard the sound of glass breaking in the kitchen window, and heard Slaypak cry loudly for help.

{¶ 22} O'Brien turned to see "the guy with the gun and [Reed] come through [her] kitchen door, * * * yelling, 'Give us the money.' * * * [Slaypak] got a foot or two into the dining room" before Reed hit him again. At that point, Slaypak told them that the money was in the couch cushions.

**{¶ 23}** O'Brien was standing behind the couch and near the front door. Rios bent to lift the couch cushions; O'Brien took the opportunity of his inattention to her to flee the house. Once outside, she ran to a neighbor's house; she heard gunshots and Slaypak's screams as she pounded on the neighbor's door.

**{¶ 24}** Other neighbors also heard the shots and screams; some of them looked out their windows. Subsequently, they were able to provide the police with information about at least three men running to a silver-colored car parked on the street. One man wore a distinctive hat and a yellow T-shirt. Another called out, "Hurry up, Boy."

**{¶ 25}** The police received several 9-1-1 calls beginning at 5:10 a.m., all within moments of the shooting. By the time the officers and the emergency service arrived at the Bernard house, however, Slaypak was dead on the front porch; he had been shot twice in his torso.

**{¶ 26}** O'Brien returned to the Bernard house to provide information about the assailants. Detectives used her information; first they located Schade. After Schade described her experiences of August 20 through 21, 2008, Reed was apprehended for his part in Slaypak's murder.

**{¶ 27}** The record reflects Reed's case proceeded to trial and to his convictions on several counts, including aggravated murder. On April 27,

2009, at Reed's sentencing hearing, he produced an affidavit in mitigation from Rios. Rios averred in this document that he had been a witness during the incident that led to Reed's convictions.

{¶ 28} Based upon this new information, Det. Thomas Armelli, the assigned investigating officer, interviewed Rios. Despite being presented with the opportunity to consult with his attorney before making any statements, Rios proceeded to provide one without counsel's presence. Rios initially claimed he did not know anything about the murder, then claimed he remained in the silver car during the incident, then claimed he tried to prevent Reed from committing the crimes.

{¶ 29} Armelli also placed Rios into separate physical "line-ups" for O'Brien and Schade. Both women identified Rios as one of the men who accompanied Reed on the night of the incident.

{¶ 30} Eventually, Rios was indicted in this case, charged on eleven counts. Counts 1, 2, and 3 charged him with aggravated murder, Counts 4, 5, and 6 charged him with aggravated burglary, Counts 7, 8, and 9 charged him with aggravated robbery, and Counts 10 and 11 charged him with kidnapping. Although the first three counts originally contained felony murder specifications, the state later dismissed those specifications. Each count contained a three-year firearm specification.

{¶ 31} Rios's case proceeded to a jury trial. The jury acquitted Rios on Count 1, but found him guilty of two counts of aggravated murder, and also guilty of the remaining counts of aggravated burglary, aggravated robbery, and kidnapping with firearm specifications.

{¶ 32} The trial court thereafter sentenced Rios to a prison term that totaled twenty-six years to life, i.e., the court merged all the firearm specifications, thus imposing a three-year term to be served prior to and consecutive with the following: consecutive terms of twenty years on Count 2, three years on Count 4, and three years on Count 6, and concurrent three-year terms on Counts 7 and 9. The court merged Count 3 into Count 2, Count 5 into Count 4, Count 8 into Count 7, and Counts 10 and 11 into Counts 4 and 6.

{¶ 33} Rios appeals from his convictions and sentences with four assignments of error.

{¶ 34} "I.  **The trial court erred in denying Appellant's motion for acquittal as to the charges when the state failed to present sufficient evidence against Appellant.**

{¶ 35} "II.  **Appellant's convictions are against the manifest weight of the evidence.**

{¶ 36} "III.   Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments when defense counsel by not filing or requesting a a [sic] hearing on a Motion to Suppress statements.

{¶ 37} "IV.   The trial court erred by ordering convictions and a consecutive sentence for separate counts of aggravated murder and aggravated burglary because the offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14."

{¶ 38} Rios argues generally in his first assignment of error that the trial court erred when it did not grant his Crim.R. 29 motion for acquittal. Without specifically citing any elements of the crimes for which he was convicted, he simply claims the state presented insufficient evidence to prove his guilt.   This court disagrees.

{¶ 39} Under Crim.R. 29(A), a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt."   *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.   "In essence, sufficiency is a test of adequacy.

Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 40} In determining whether a conviction is supported by sufficient evidence, the appellate court must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The evidence must be viewed in a light most favorable to the prosecution. Id. at 273.

{¶ 41} Rios asserts the testimony lacked credibility and established "reasonable doubt" as to his "culpability." This court reminds him that claims regarding credibility are not proper under a review for evidentiary sufficiency. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶79.

{¶ 42} When viewed in a light most favorable to the prosecution, the evidence in this case demonstrated Rios's complicity in the aggravated murder, aggravated burglary, aggravated robbery, and kidnapping of the victims. Rios accompanied Reed to the Bernard house, where they both became aware Slaypak was peddling drugs. After getting Schade home, Reed, Rios, and the other man borrowed her car, went back to the Bernard

house a second time, and took O'Brien's money that lay on the kitchen table before they left. Then, upon receiving angry calls from O'Brien about the money, the three men returned to the Bernard house with the intent to obtain more.

{¶ 43} O'Brien's testimony proved Rios took an active part in each offense. O'Brien saw Rios walk right into the house and into the bedroom to order Slaypak to get up. She saw one man pointing a gun at Slaypak as all of the men, including Rios, surrounded him demanding money. She saw Rios hitting Slaypak. O'Brien further indicated Rios followed her in an intimidating manner during her search for Slaypak's money.

{¶ 44} In light of the foregoing, the trial court correctly denied Rios's motion for acquittal of the charges. *State v. Pettway*, Cuyahoga App. No. 91716, 2009-Ohio-4544; *State v. James* (Sept. 24, 1998), Cuyahoga App. No. 72922. Rios's first assignment of error, accordingly, is overruled.

{¶ 45} In his second assignment of error, Rios argues his convictions are not supported by the manifest weight of the evidence. He asserts the jury lost its way in determining his guilt, because evidence of his intent is lacking. A review of the record fails to support his argument.

{¶ 46} With respect to an appellate court's function in reviewing the weight of the evidence, this court is required to consider the entire record and

determine whether in resolving any conflicts in the evidence, the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. This court must remain mindful, however, that the weight of the evidence and the credibility of the witnesses are matters primarily for the jury to consider. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

**{¶ 47}** In this case, the state's witnesses presented testimony that provided a consistent and coherent version of the incident, provided a timeline that was verified by cell phone records and 911 calls, and provided evidence that remained unshaken on cross-examination. *State v. Wilson*, Cuyahoga App. No. 90267, 2008-Ohio-3354, ¶34. Rios's version of his actions on the night of the incident, as he presented in his statement to Armelli, on the other hand, were inconsistent and were belied by the physical evidence obtained.

**{¶ 48}** Initially, Rios could not explain why he signed the affidavit on Reed's behalf without reading it. Then he provided several different versions of his activities on the night of the murder, finally conceding he was present,

but asserting he tried to prevent the shooting. Rios could not provide a believable reason for waiting until Reed was convicted before coming forward.

{¶ 49} O'Brien's testimony contradicted all of Rios's versions of the incident. The jury weighed credibility and it, as the fact finder, was free to believe all, none, or some of what the witnesses said during trial. In addition, the jury was well aware of the way in which O'Brien and Schade became acquainted; the jury nevertheless could determine that their attenuated relationship lent credence to their separate but similar accounts of what occurred on the night of the incident.

{¶ 50} This court cannot find, therefore, that the jury either lost its way or created a manifest miscarriage of justice. *James*; see, also, *State v. Jenkins*, Stark App. No. 2008 CA 00191, 2009-Ohio-6254. Accordingly, Rios's second assignment of error also is overruled.

{¶ 51} Rios argues in his third assignment of error that his trial counsel rendered ineffective assistance by failing to either move for or obtain suppression of Rios's oral statement he provided to Det. Armelli. In light of the record, his argument lacks merit.

{¶ 52} The claim of ineffective assistance of counsel requires proof that "counsel's performance has fallen below an objective standard of reasonable representation" and, in addition, prejudice arises from counsel's performance.

*State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus; see, also, *State v. Lytle* (1976), 48 Ohio St.2d 391, 358 N.E.2d 623. The establishment of prejudice requires proof "that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." *Bradley*, paragraph three of the syllabus.

{¶ 53} The burden is on appellant to prove ineffectiveness of counsel. *State v. Smith* (1985), 17 Ohio St.3d 98, 477 N.E.2d 1128. Trial counsel is strongly presumed to have rendered adequate assistance. Id. Moreover, this court will not second-guess what could be considered to be a matter of trial strategy. Id. The record in this case with regard to trial counsel's actions fails to demonstrate counsel's performance fell below an objective standard of reasonableness.

{¶ 54} At the outset, trial counsel informed the jury that the police found Rios only "because he told them that he was there." The defense strategy thus clearly was to *acknowledge* Rios's statement. Trial counsel wanted the jury to know that Rios eventually provided "his entire story" in his statement to Armelli and another detective for two reasons.

{¶ 55} First, counsel sought to portray Rios in the best light possible. The videotaped statement shows that Rios ultimately cooperated in the investigation, and, during a pause in Armelli's questioning, Rios wept as he

sat in the room by himself. Defense counsel sought to demonstrate Rios lacked any direct culpability for either Reed's or the shooter's actions, but remained fearful of reprisals from them.

**{¶ 56}** Second, counsel sought to point out that Rios made the statement in spite of the fact that, at the outset, Armelli paid no attention to Rios's assertion that he had an attorney, and further failed to inform Rios that his interview was being videotaped. The defense sought in this manner to portray the detectives as devious; counsel's questions of Armelli emphasized all the untruths Armelli and his partner provided to Rios during the taped interview.

**{¶ 57}** In light of the overwhelming evidence against his client, this court cannot find trial counsel's strategy, albeit unsuccessful, constituted ineffective assistance. *State v. Flors* (1987), 38 Ohio App.3d 133, 528 N.E.2d 950. Consequently, Rios's third assignment of error also is overruled.

**{¶ 58}** In his fourth assignment of error, Rios argues the trial court erred when it sentenced him to consecutive terms for his convictions for aggravated murder and aggravated burglary. Rios contends these offenses should have been merged pursuant to R.C. 2941.25(A). This argument is rejected.

**{¶ 59}** R.C. 2941.25 provides:

**{¶ 60}** "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶ 61}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶ 62}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, at paragraph one of the syllabus, the Ohio Supreme Court recently has held that in addressing an argument such as Rios's, a reviewing court must consider the "conduct of the accused" to determine whether the crimes were "allied offenses of similar import subject to merger under R.C. 2941.25."

**{¶ 63}** Thus, even if the defendant's conduct occurs in a "single transaction," should the court find that the offenses were committed with a "separate animus," the defendant may be convicted of more than one of the offenses. Id., ¶51. See, also, *State v. Wynn*, Cuyahoga App. No. 93057, 2010-Ohio-519. *Johnson* held at ¶48:

{¶ 64} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other <u>with the same conduct</u>, not whether it is possible to commit one *without* committing the other. [*State v.*] *Blankenship*, 38 Ohio St.3d [116] at 119, 526 N.E.2d 816 (Whiteside, J., concurring)." (Emphasis in original; underscoring added.)

{¶ 65} In a case such as this one, therefore, in which Rios's conduct in entering the house with his cohorts in order to rob Slaypak and O'Brien, then aiding and abetting the subsequent gunshot murder of Slaypak, constituted distinctly separate crimes, the trial court did not err in convicting and sentencing Rios for each offense.

{¶ 66} A review of the record demonstrates the trial court "merged" all of the firearm specifications,  "merged" each offense that warranted application of R.C. 2941.25(A), and imposed consecutive terms for Rios's commission of aggravated burglary and aggravated murder.  Since this sentence comported with statutory requirements, Rios's fourth assignment of error also is overruled.

{¶ 67} Rios's convictions and sentences are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

PATRICIA ANN BLACKMON, P.J., and
SEAN C. GALLAGHER, J., CONCUR